Good morning, Your Honors. Erin McCampbell Parris on behalf of Appellants. May it please the Court. I'd like to reserve five minutes for rebuttal. The statutes should be enjoined for three key reasons. First, Section 19858 does not allow a person who is a part of California's cardroom market to participate in the lawful economic balkanization like this is and always has been a violation of the Commerce Clause. The Commerce Clause was designed to foster trade among the states and to ensure that each merchant had the right to bring his or her wares to each state. Section 19858 tramples that right. Second, this Court has controlling precedent that says that California cannot do what it is doing here. I'm talking about the Daniels and the Christies cases. In those cases, this Court has already told California that it cannot restrict in-state licensees or residents from engaging in lawful economic opportunities in other states. But that is exactly what the Section 19858 is doing here. It's like saying, if you want to do this here, then you can't go over there to that other state and do that there. A burden like this is and always has violated the Commerce Clause. Third, the face of Section 19858 discriminates against interstate commerce by discriminating between, A, firms engaged in intrastate commerce and, B, firms engaged in interstate commerce or those who would like to engage in interstate commerce. It works like this. If you are involved in the markets of any of the other states or if you want to be in those states, then Section 19858 says that's a hard no. You can't do it. But if you are content to only be within California's market or to only be within a market of another state, you get the green light. But doesn't this fall on both in-state and out-of-state businesses similarly? Are you referring to tribal casinos? Well, I'm more asking about the limitations that the statute imposes on cardroom owners and what they may invest in otherwise. It seems that whether you're an in-state cardroom owner or an out-of-state person who has an interest here, it falls similarly. Does it not? So, if you are talking about discrimination based on residency, which is kind of like the thing we all learned about in law school where, you know, a citizen of one state can't enter another, we have conceded that the face of the statute does not do that. What it does here, it only comes into play when we're talking about firms who want to engage in the markets of two or more states, interstate firms. If you are a firm that wants to be in any state plus California, you can't do that. So, it's discriminating against firms who want to do that or, like our cardroom licensees, firms who are in the state. To Judge Bress's question, I think it may have the effect of doing that because other states don't have the same kind of card, the same kind of games that California has. But it doesn't directly do that, right? Because if every other state just had exactly the same kind of games California had, then you agree that you could, nothing would prohibit an in-state person that owned a card, these kind of games, to own a place out of the state. So, it has that effect, but it doesn't do it directly. Would you agree with that? Well, it says within or without the state. And we know that within the state, casino-style or banked gambling is prohibited under Penal Code Section 330. So, it can only reference what's happening outside the state. Because what's happening inside the state, that activity is already prohibited. And so, that's the problem. That's why we say on its face it's doing that. And secondly, when you look at dormant commerce clause precedent, the courts are always looking at the state of play. They're looking at not just what's happening in the home state or the enacting state and what they're doing, but what the impact is on the market as a whole. And when we look at the state of play here, every other market has casino-style or banked-style gaming. And so, by the statute on its face implicating what's happening over there in those other states, it's targeting firms engaged in interstate commerce. But to what extent does it benefit in-state interests at the expense of out-of-state interests? That would seem to be more the core concern of the dormant commerce clause cases. That is one of the factors the court has talked about as being a factor indicative of discrimination. They've also talked about statutes discriminating against firms engaged in interstate commerce as well as statutes that isolate a state's market. So here we have that present here as well. California's market is completely isolated from the markets of the rest of the state. If you look at, for example, in our amicus counsel's briefing, cardroom licensees can't even get highly skilled managers from other states and other markets because, like many industries, casinos compensate highly skilled employees with stock options. And so it's something that completely California does this in a lot of different areas, it seems to me. We have the pork producers case, but you have the foie gras case that I was involved with, and California says you can't have this. I think, if I remember right, California was, in theory, you could have foie gras, but you couldn't have foie gras that was made in the way that foie gras is produced, right? So that's just what they do, and it seems like our court and the Supreme Court have said that, you know, if it has those extraterritorial effects, which, you know, I understand your argument to be that basically it does here, but it did in those cases, too. In those cases it didn't make a ban. Those statutes are an entirely different category of statute than what we have here. In those statutes, California was regulating economic activity occurring within its borders, whether it was the sale of pork, foie gras, transportation of shark fins, any of those cases we're looking at what's happening inside California. So if we want to take, for example, pork producers, the analogy here would be if California's statute said you can't sell crated pork within California, and if you do it, or if you invest 1 percent, or pardon me, more than 1 percent in any company that does it, whether within or without California, meaning anywhere, you can't come to California and sell your crated pork here. The Constitution guarantees merchants to have the right to go to each state and to follow those rules of that state. So the pork producers had a freedom that the cardroom licensees here do not have. Wait, wait, wait. So using foie gras, because I'm just more familiar with that, it said you can't sell foie gras that's been produced a certain way in our state. Yes. And that foie gras wasn't produced in California, but it was produced in other states, and so their argument was you're actually regulating how foie gras is made in other states by doing this. And that argument didn't have any traction. So I'm having trouble seeing the difference between that and there's obvious extraterritorial effects, but I'm having trouble seeing how my instinct might be that even if I'm inclined to agree with you on that, it seems like we're pretty tied up by Ninth Circuit case law and by the Supreme Court's case law in doing anything about that. So I want to first address the foie gras case, and then I want to talk about this Court's precedent that I think is helpful to us here. In terms of the foie gras case, there, California was limiting what could happen within its borders. I mean, you can't do, you can't sell or provide this food item here. If people outside of California chose to react to that, that was the effect, right? That was the indirect effect. I would characterize this the same way. It's saying you can't, you can't be involved in this other type of businesses if you want to be involved in this business in our state. So why is that not, I mean, if I can just circle back to the foie gras, the difference here would be if California said, on top of the fact that you can't sell it here, if you sell it anywhere, then you can't enter our market, right? So the people who produced foie gras had the economic freedom and the right to sell foie gras anywhere else in the state if it was made under that method. So under your argument, would you, you know, there are states, states will sometimes have laws against vertical integration, you know, like they'll say you can't own a gas station if you also produce oil, right? Yeah, excellent. So, and I'm having trouble seeing why your argument wouldn't mean that those, because that's what you're doing in that instance. You're saying, you're saying you can't engage, especially if you're like in the Exxon instance, the, let's say a state did not have any oil producers in its, in its borders. So by, by default, I guess it is regulating, it is, it is trying to control what you can do outside of its borders. So why, why under your argument would those cases not come out differently? So in, in that case, and I wanted to discuss that because there's three key differences between the regulation in Exxon and this one. But in that case, again, we're talking about the regulation of an in-state economic activity that if people outside the state choose to react to it, they can, but they don't have to, and they can continue doing business as they would like elsewhere. So in Exxon, there's three big differences from what we have here. First, the court did not find any discrimination. And they didn't find that because of the fact that the retailers who were selling the gasoline were a mix of, you know, in-state local retailers, firms engaged in interstate commerce, companies located outside the state that had stations within the state of Maryland. So, and furthermore, the finished product of the oil producers still made it into the state. They just couldn't sell it directly to the consumers. The reason that this statute came about was an in-state problem, which was that the oil producers, when they had their own stations, when there were times of shortages, would sell only to or favor their stations first, and there were broad swaths of the state that either had no or low amounts of gasoline. So this idea that vertical integration was causing this problem within the boundaries of Maryland was what the statute sought to tackle. We don't have that here. Everything the statute is targeting is happening outside the state of California, and it's targeting it on the face of the statute. It's not an indirect effect that permeates out of California based on, say, its market size. It is something that is expressly targeting firms engaged in interstate activities. And third, another key point. Now, when you say targeting, it feels like an effect to me because it would be easier it would be more clear that it was targeting out of California if it only banned ownership of casino-type games, you know, out of the state, but not in the state. And I understand they don't allow them in the state, but that's not, it seems, why is it not true, why is it targeting if it's possible that California is just saying, we don't want to have people that own these other type, in or out of state, to own these type? Let me just use a real simple example. California, for some goofy reason, decides they don't want people selling both eggs and milk, right? So they say, if you sell eggs, if you sell milk, you can't sell eggs, right? You know, it's kind of our situation here. And we don't, we feel so strongly about the no selling both that you can't sell, if you're a company that sells milk out of state, too, we don't care whether you sell in or out of state. That's the situation. Why is that targeting out of state, out of state, why is that targeting as opposed to having an effect? It definitely has an effect, no question. So I just want to push back slightly because in that hypothetical, you know, we're talking about two different industries, one dairy, one poultry, and here we're talking about something that targets an entire industry, the gaming industry nationwide. But separately, in that scenario, both the eggs and the milk, they still make it into the state, the parties still are able to sell it, they just can't sell both. We have something very different here. You cannot enter this market. And if you're a cardroom licensee, the right that the Supreme Court has announced and articulated in Dennis v. Higgins, which is the right to go to every state and to follow those states' rules and engage in lawful economic transactions, you can't do it. So it's a big, big difference from what we've seen in most of the other cases. Right, but you can't do it regardless of your state of residence. It doesn't discriminate against people based on where they are. Correct. And we have conceded that that particular form of discrimination, which is just one of the forms the Supreme Court has recognized, is not present here on the face of the statute. But the other one that is just as pernicious, discrimination against firms engaged in interstate commerce, is present here. Third, another key point is that this statute completely isolates California's market from the rest of the country. And that is something, as well, you see over and over again, including in the Dennis v. Higgins case, where it has been known since the foundation of this country that if a state was to do that, if we allow the states to engage in that type of economic balkanization, then we are not going to have the unified economy that our founders wanted us to have. And it's a direct violation of the Commerce Clause. Don't worry about the clock, because this is an important case, and I want to make sure all the questions are asked. I do have some follow-ups.  One thing about this case is that it involves gambling, which most, I think the Supreme Court has said, is sort of more of a state concern. How does that factor into the Commerce Clause analysis, if at all? I don't think that this would be something that, say, would be akin to, like, alcohol, where the states have a superpower designated to them in the Constitution. But more importantly, California has the tools it needs to protect the integrity of its markets. There are over 200 statutes dealing with gaming. We're challenging just the two, the two instances where California used the improper means. California has statutes that vest the commissioner with the discretion to deny an application or revoke a license based on a whole bunch of factors, like the applicant's character, their reputation, their integrity, their business associations, their economic activities, whether they're involved with or profiteering from criminality. Those statutes are already on the books, and we don't challenge those means because they are, you know, fully inconsistent with the Commerce Clause. The two sections we're challenging are where California is using a means. The Supreme Court and this Court, for instance, in Daniels and in Christie's, has told California it cannot do. The market will be protected. Its integrity will be protected by statutes already on the  But California is not telling people they can't invest in these businesses, casinos. It's saying, if you want to have a license to run a card room here, you can't do that. Doesn't that seem like a little bit different? The way it is, it's simply this. If you are a member of this in-state industry, you do not have the right to be a part of the market in any other state. And that's just a straight-up violation of the Constitution. And in Christie's, if I could just speak a moment about that, there, California had a regulation that said that all of its medical waste had to be disposed of by incineration. And one of its licensees was removing waste from the state and for a while had been disposing it somewhere in, I think, Maryland, actually, via incineration, but then decided to move somewhere close to home and dispose under another method in a state where that was lawful that wasn't incineration. And California revoked the license and said, no, it's our waste, you know, you're going to follow our rules. And this court stepped in and told California, you cannot condition in-state licensing on forcing a party to forego its lawful economic opportunities in other states. You just can't do it. But how about when the idea is to protect in-state conduct? Because here, the theory of the law is that we need this to protect the in-state transactions and dealings in cardrooms. That's an in-state issue. It's not purely out-of-state. So we don't dispute that California has the right to protect the integrity of its markets. In fact, if they didn't do that, and if the markets, if the casinos and cardrooms were not perceived as being lawfully operated, customers wouldn't go there. But the bottom to enforce them. It would be like if California said we're not going to allow any products that were manufactured out-of-state to come into the State, versus saying we're going to have laws that regulate the caliber and the quality of products that are imported and we're going to inspect them. That's the distinction here. You can't have that blanket ban. We're asking California to follow its rules, which are already on the books, that allow them broad discretion to vet every applicant and every licensee seeking renewal based on a whole host of activities that are more actually fulsome than this simple issue in Section 19858. They can deny an applicant based on character, integrity, or perceived lack of integrity. So why can't they say that somebody who's operating or investing in a casino lacks the character to run a cardroom? If this statute wasn't validated, they may on an individual case-by-case basis do that. But because of the means If you can see that, why can't they do it en masse? Because the means used here is what's at issue. It's not the goal. It's the means used. And the means used here isolates California's market from the rest of the country. It deprives anyone who's a part of this market from their constitutional right to engage in lawful interstate commerce in every other state. And it also targets and discriminates against firms who are engaged in or who desire to engage in interstate commerce. What are examples of Dormant Commerce Clause cases that involve this kind of licensing? Because one concern someone could have with this position is that states all the time impose licensing requirements for various different kinds of occupations or businesses. Many of those restrictions or conditions of licensing might in turn have an effect on interstate commerce in the way that this seemingly does too. But have we thought that those kinds of licensing regimes implicate the Dormant Commerce Clause in the way that you're arguing? No. And we can talk a little about LensCrafters. That's an example of a profession being regulated. But no, those are examples of the state regulating what is occurring within its borders. And that is a distinction from this. And for example, in LensCrafters, right, they looked at the different educational and on-the-job training experiences that different professions had, optometrists, ophthalmologists, and opticians. And they said opticians can't engage in one-stop shopping here. You can't pair up with an optometrist or ophthalmologist to sell your eyewear where these eye exams are happening. The difference, okay, so the opticians had to come to California and they had to follow California's rules. But when they left California, they were free to engage in the economic activity of offering one-stop shopping in every other state where that was lawful. So that's a distinction. And we do not challenge California's ability to restrict what's happening within its borders. The problem with this statute is it does not come into play unless we're talking about what's you know, over there in that other state. And that's the issue. Is that only because gambling is otherwise illegal in California? Yes. So gambling is illegal. Can I ask you a follow-up to that? Because it seems like your argument, the way you're presenting it, is if California allowed the same kind of gambling that Nevada has but then said you can't own, you can't, had their same rule, right, that you can't own a card room, you can't have any ownership in a card room and gambling that overlap, no company can overlap ownership, then you would be okay with, you would say that does not have a problem. But it's, it just happens to be that California doesn't have gambling that makes this a commerce clause problem? So your hypothetical would be a little bit of a different scenario. And one of the key differences is that California's market wouldn't be cut off the way it is. I mean, I guess in this scenario, it would be like most of the other states, I think 42 that have authorized casino-style gambling. Here, the statute, the way it's structured, it cuts off California. But this is where I'm really struggling with your, and I know we've taken you over, but that seems to be a common effect any time California or some other state says we want to do something. So like if food, let's say California, we want a certain size for chickens to be raised in. And let's say it's different than every other state. That will isolate their market. That will have the effect of isolating their market. And so, I don't think we've said there's a commerce clause problem there in the pork case. So I'm trying to figure out, what they've said here is we don't want card rooms to have overlapping ownership with Nevada-style casinos. And that is regulating in-state conduct that has, it may have the effect of only banning people from out of state because they don't have casinos in-state. But they could have casinos in-state, and then it wouldn't, I don't, I'm really struggling to see how yours is different than these other examples. And cage, certain cage sizes for chickens. So it's very different from those. And I want to try to, you know, walk through that and make sure I can get you comfortable with that before I sit down, which is that in those cases, California is saying the rule of play for our market here is you can't have crated chicken or pork producers crated pork, or you can't sell foie gras made by this manufacturer through this method that we don't approve of. The people who, let's assume in this scenario, all of the people who provide these food source, they're located outside the state of California. So those people have a choice, okay? And if a liberty and a freedom that our clients do not have here, which is that they can make a couple different choices, right? They can choose to say, you know what, it's going to cost too much money. I'm not going to mess with California's market anymore. Or they can say, you know what, we'll segregate part of our farm and we'll do this this way for California. And then the other states who let us do what the way we'd like to do it, which is, you know, to raise foie gras on the traditional method, we'll continue to sell that there. That right there, our clients don't have that freedom. Mrs. Flint. I mean, I could change, I think a little bit now that they say California says, just chickens sitting in two smaller cages or even big cages, looking at chickens in small cages. We don't want them to have that emotional distress that we have. And so you can't have, if our chickens, if you can't bring in chicken that was raised at any farm where other chickens were in. So California could, seems like California could do that. It's still talking about what's going to be on the grocery shelves in California. This statute. Then this statute, you could say this statute is talking about what the ownership of our card tables in California is going to look like. It doesn't because it doesn't come into play. There are no casinos in California. So it only comes into play when we're talking about what's happening in another state. And we have other statutes on the books that address this very issue that give the commissioner such broad discretion that a factor like character or lack of character is enough to deny an application. This statute, the means used here, violates the Commerce Clause for three key reasons, in that it discriminates against firms engaged in interstate commerce. It forms an absolute barrier, an economic barrier around the State of California. And both those issues were discussed in Dennis v. Higgins and recognized as violating the Constitution. And third, it is California using its in-State licensing, just like it did in the Daniels case, to force licensees to forego lawful economic opportunities in other states. It's actually worse than that, because at least in Daniels, the waste management company could go to other states and take those states' waste and dispose of them however they wanted to. We don't have that freedom here. So this case is actually worse than that. The only reason this statute comes into play is because one person to a property that's happening wherever happens to also have a cardroom license. And Christie's is another example. Christie's says you can't do that. That was the art case. A lot of what you're arguing seems to be about extraterritoriality. And we haven't talked about pork producers, but we held this case for pork producers. And pork producers seems to cast a lot of doubt on how much of the Dormant Commerce Clause really is about extraterritoriality. So can you respond to that specifically? Yes. We're fully consistent with pork producers. So in that case, it looked to me, what the court was saying is that, you know, if folks got the impression that there were extraterritorial effects and that was a per se automatic violation, no. We're looking more carefully at what's happening with the statute. It's not an automatic violation. And what they said was that when there's discrimination like what's present here, and around page 370 or so, they talk about discrimination against firms engaged in interstate commerce, even though that wasn't the focus of the opinion, they talk about it. They said that is just as bad as discrimination based on residency. And third, the third factor that we have here that wasn't present in pork producers at all is the fact that the statute isolates California's market from the rest of the country. It also prohibits licensees from their constitutional right to engage in trade in other states. So those pork producers had a freedom our clients do not have. They had the ability to go to the other states and to sell crated pork, as ugly as it may be, and to do it wherever it was lawful to do that, and then still come to California and meet California standards here. And that's what we're asking to do. We're saying, how much of the isolationism, though, is driven by the the background policy choice not to allow slot machines and casino style gambling in California, except in the case of Indian is really rooted in that, because we could look at this regime and say California is very isolated from the interstate gambling market in the sense that we don't allow it here. Well, I understand that casinos operated on tribal land are not part of California, but I mean, there's dozens and dozens of them, right? So they're not isolated. I suppose in that sense, there's there's gambling happening here. This isn't a state like Hawaii or Utah that has no gambling whatsoever of any kind. They have card rooms and California's card room licensees want to follow the rules here. They want to have, you know, card rooms that are, you know, well thought of, but they want to be able to go to other states and to do what is lawful in those states. And, you know, it's to give an example, you know, like in my home state, New York, AR-15 rifles are illegal. A win for California here means that New York gets to say, OK, AR-15s are still illegal here. And gun manufacturers and retailers, if you sell them anywhere in the United States or if you have more than a one percent interest in any company anywhere in the United States that has that sells those rifles, you can't come to California's market. And we can keep doing this. And the subject matter, no matter what it is, a state is going to have the right to do that. And that is a tremendous power that has never been recognized in any case, Supreme Court or this court. It's at odds with what the founders wanted, which was a unified nationwide economy. And it's going to really redefine the economy in the United States. All right. I think we've obviously taken you over your time, but I think we'll ask you to take a seat. We'll put five minutes on the clock for rebuttal, optimistically. And we'll hear from Mr. Klein. Thank you very much. Joshua Klein for the appellees. May it please the court. Under the Supreme Court's and this court's precedents, all three of the plaintiff's claims fail. Their claim that the statute is virtually per se invalid, which is really what they're arguing as an extraterritorial regulation, is foreclosed by Part III of the Supreme Court's national PORC decision, which is a part that's where the — which speaks for the court, not a plurality, and held there is no separate extraterritoriality test for dormant commerce. Their claim that it's per se invalid because it affects interstate investment, which also I think they're now characterizing as a discrimination against interstate investment, also fails. And the questions got it right, I think. What these plaintiffs want is essentially what the plaintiffs wanted in Exxon, to engage in an in-State business. Here it's card rooms. In Exxon, it was owning 36 retail gas stations that the State wants to insulate from another — from the ownership of another kind of business. Here at the casinos, in Exxon, it was refineries and producers. And under Exxon, the fact that the second activity would be entirely out of State does not mean that the State's regulation of the in-State conduct is invalid. And that leaves a pike claim, which precedent makes extremely hard to establish. And at the first step, the plaintiffs haven't shown a substantial effect on interstate commerce because burdens like inefficiency and foreclosing preferred ownership structures or methods of operation don't count under Exxon and this Court's National Pork decision. And if there are burdens, the plaintiffs couldn't show they're sufficiently excessive to justify this very rare kind of invalidation under an implied power. Worries about casinos' susceptibility to crime and corruption have been repeatedly and recently acknowledged by the Supreme Court, which has characterized also gambling as an area where Congress envisions the benefits of local regulation, which may be different state to state. So to invalidate this statute on the basis of what's only an implied authority of the Dormant Commerce Clause would go beyond what Supreme Court precedent or this Court's precedent allow. And with the Court's permission, I'll just start with extraterritoriality. Part III of the Supreme Court's National Pork decision, the Court held that there's no special kind of claim for extraterritoriality under the Dormant Commerce Clause. The Court went on, obviously, to consider a pike claim, whether those — whether extraterritorial effects constituted a substantial burden, but they didn't apply any kind of special test. And, in fact, they said that such a special test has no effect or has no place. Your friend on the other side seems to be arguing, well, there's not really much regulation of in-state conduct here. It really more falls out of state. So how do you address that? Your Honor, what we're regulating, what the state is regulating, is the ownership and operation of card rooms, all of which are located entirely in the state of California. Now, even if you compare this to Daniel Sharpsmart and Sam Francis, this Court's early earlier decisions, you can see how different this is. In Sam Francis, the problem this Court noted was that there could be regulation of sales which occurred entirely out of state, transactions entirely out of state, based on nothing more than the in-state residence of one party. We're not doing anything of that sort here. As this Court has noted, California residents are free to buy and sell shares in casinos across the country. What's being regulated is whether they do that simultaneously, as in Exxon, with the in-state continuing operation of an in-California card room. And if you compare it to Daniel Sharpsmart, for instance, what had happened there, the problem was that the medical waste had completely exited California's borders. The California, the state was trying to regulate what could be done with it outside those borders, and there was no — there wasn't — they weren't doing it on the basis of a state interest in continuing regulation of in-state activity. I don't think that case can be read as meaning that for where there is regulation of in-state activity, that the state is not allowed to regulate things that have some out-of-state effects. And, you know, just to give an example, if a California lawyer in a representation of a California client takes those clients' confidential files, drives them to the state border, and then breaks what would be the California rules of confidentiality with those files, I don't think that Daniel Sharpsmart would go so far as to say that it's impermissible for California, as part of its licensing and regulation of the in-state conduct of that representation, can't be interested in preventing that breach. Are any of our cases, particularly Daniel Sharpsmart, is there any tension between some of these and what Pork Producers now has to say about extraterritoriality, or do you think these are all reconcilable? I'd go further than saying that there's just tension. Daniel Sharpsmart uses the words virtually per se invalidity of extraterritorial regulation. And Part 3 of the Supreme Court's national pork said, considered that very rule and said it does not apply, and certainly doesn't apply outside the very narrow category of price-matching statutes. Okay. So you think there's parts of Daniel Sharpsmart, or at least statements in it, that are not correct? Yes, Your Honor. But I mean, I would say also that even under this Court's earlier precedent, this Court's precedent in the national pork case, that these plaintiffs' extraterritoriality claims would also fail, because, as this Court said, that principle before the Supreme Court decision still only applied where it was entirely out-of-state conduct being regulated. Right. But what I hear you saying, I think, is that the result in Daniel Sharpsmart may still be correct under pork producers. Your Honor, I don't think I have a reason to disagree with that, but I think that would probably happen through some different mechanisms and different kinds of claims, right? The Supreme Court in pork producers said, well, you could consider a due process claim about whether there's a rational basis for the state to extend its legislative authority into another state. You know, the Supreme Court also noted the presence of fair faith and credit claims. There could be other claims. And many of these cases, frankly, may end up decided on preemption grounds where Congress has actually acted in a way a court can apply, instead of under the implied authority of the Dormant Commerce Clause. I mean, you know, there was an element of that in the foie gras case, for instance. So, I think that that's a long way of saying that I don't think the result in Daniel Sharpsmart would necessarily change, but the doctrinal basis for it would be quite different, and certainly different from what the plaintiffs are arguing here. If I may, I want to also address the plaintiffs' claims about direct regulation of interstate investment or discrimination against interstate investment. And I just want to emphasize how closely this matches what was going on in the Exxon case. Challengers want to own one kind of business in-state, 36 gas stations in Exxon and California card rooms here. They also want to own simultaneously another kind of business, refineries and gas production in Exxon, here casinos. The State legislature has determined that the ownership, the co-ownership of these two kinds of businesses is a problem, and has enacted, therefore, a law which essentially puts people to the choice. You can engage in one kind of business or the other, choose which one is more valuable to you. And in Exxon, as here, the fact that one type of business happens to be entirely out-of-state does not mean that the State is barred from exercising its legislative power in that way. And, you know, if you think about how different, when, during the briefing of this case, the plaintiffs were relying for their interstate investment and discrimination against interstate commerce claims on cases like Lewis and Edgar v. Might, which just show how far afield from actual precedent this kind of claim is, right? And Lewis was, frankly, a straight-up discrimination case where there was explicit discrimination against out-of-state, against bank holding companies with a principal place of business outside Florida, so they could not offer certain services in Florida. And even then, the Court ruled on the basis of pike balancing, not some, not the special regulation of investment claim that the plaintiffs are claiming. And Might, similarly, the opinion for the Court was a pike balancing opinion. There was some plurality discussion of the interstate effects of the regulation. But, you know, there, I think that the most pertinent thing was that, you know, to put this in more of the extraterritorial box, that the Court noted that the terms of the statute would allow a regulation of entirely out-of-state transactions based on nothing more than the in-state incorporation, equivalent to residency, of the company. And, again, California's not doing anything like that here. Californians, just like anyone else in the country, can make the choice of investing in the California cardroom-regulated industry or investing in casinos wherever they may occur. And is it strictly a legislative decision to say, you know, gambling 100 years ago was completely different than it is now? You can't watch a sporting event without being bombarded with advertisements for online gambling, et cetera, et cetera. And we just, there may come a time when the legislature says, you know, we don't really need to do this anymore, and there's nothing we do in the meantime? Or is there some point where the regulation becomes so ridiculous that a court should step in and say there is no logical nexus here? Well, Your Honor, I think there can be such a point in a dormant commerce clause case that occurs under pike balancing. But, of course, it's subject to the explicit limitations that the Supreme Court and this Court have placed on the pike balancing inquiry. And so the first step would be to establish something that counts as a substantial burden on interstate commerce. And the second step would be to establish under the very high standards of this test that those burdens clearly exceed the local benefits. And, you know, in Your Honor's words, if something is entirely irrational, then I suppose there's always some kind of a constitutional remedy for that. That's true even under the Due Process Clause or the Equal Protection Clause, right? But I don't think that the, you know, implied authority of the Dormant Commerce Clause where the Supreme Court, the end of the National Pork Opinion, which, again, the last part is written for the entire court, is written for the court, not just a plurality, says this is a very delicate business. It should be very unusual to strike something down on that basis. You know, and just to continue on the pike point, the things that they're talking about as substantial burdens are things which I think are effectively precluded under Exxon and National Pork from counting. The increased burden that happens to fall on out-of-state firms that precludes a more profitable or more effective way of offering — of operating, having to divest or avoid investments in a particular state, or, you know, some perceived disadvantage to in-state customers or firms. And let me just say it's relevant to both Pike and their discrimination arguments. They have noted that the California cardroom industry is a California industry with California employees, California businesses that pay taxes in California. As this Court noted in, I think it's International Franchise, that's surely relevant to the claim that they are so — to any argument that they are so shut out of the political process that they need some extraordinary judicial intervention where Congress has not. I want to ask Ms. Paris this, too, but for your side, in terms of the best cases that you think support your position, I've heard Pork Producers, Exxon. Anything else you would add to that list as sort of your strongest authorities? I'd point the Court to International Franchise because I think that's highly relevant to the discrimination argument. International Franchise says when there's a charge of discrimination, you almost always look — I mean, the inquiry, they don't quite use these words, but it starts with and will usually end with the explicit purposes of the statute here to keep a clean gambling industry in California so that the public, the customers, all are secure in the — in its insulation from corruption and crime. It says, you know, if there's some isolated statement somewhere which could be interpreted as meaning another — meaning there's another motive perhaps, that that doesn't get very much weight. And it points out that where in-state businesses are taking some of the brunt, that there's — that's going to count against any allegation of discrimination. I see my time has expired. If there are more questions, I'm happy to answer them. Thank you. I think not. Thank you, sir. We'd ask the Court to affirm. I want to begin by one key topic, which is that the Dormant Commerce Clause is not dead. This Court has many cases it can rely on here in ruling in plaintiff's favor. I would ask you to consider Dennis v. Higgins, where the Supreme Court said merchants have the right to go to every state and to follow the rules of those states. That is something under the Commerce Clause that is given to every citizen in this country. Second, the Court in that case said when a state puts up an economic barrier around its in-state market, that is a violation of the Commerce Clause. On those two reasons alone, you could rule in plaintiff's favor. But third, we have the discrimination that was talked about in pork producers. Discrimination on the face of a statute against firms engaged in interstate commerce. Next, I want to talk about Daniels. Daniels has not been overturned. California didn't say that. What they said was that maybe some of the language wasn't quite as strong as what it was. Daniels is still controlling here. This Court, in its panel opinion in pork producers, distinguished the regulations at issue in Daniels and in Christie's, which were like this one, you know, on their face targeting out-of-state economic activity, from the one in pork producers. When this Court looked at pork producers, it saw that regulation as being an entirely different category of regulation than what is at issue in Daniels and Christie's. Those cases are still good and they're controlling here. And under those cases, we have the very same problem those parties faced, which is that they were out of the state of California attempting to engage in lawful economic activity and California stepped in and said no. And thankfully, this Court stepped in and said that's not permitted under the Commerce Clause. I also want to talk about Exxon. In Exxon, the Court found no discrimination. And it found no discrimination because the retail gas stations at issue were equally mixed between firms who were local to the state of Maryland and firms who were located outside the country and engaged in interstate commerce. So that was a key distinction from what we have here. Second, it was regulating an in-state problem, which was that there were large parts of the state that unfortunately went without gasoline for periods of time and that caused chaos. Vertical integration was seen as the problem there because the oil companies were only selling to their own stations or favoring those. And when they finally had enough gas, get it to the other parts of the state that weren't in-state or, pardon me, that weren't their own stations. Give them to the independent stations. That's a huge problem within the border of Maryland. We don't have that here. The activity that we're talking about here occurs solely outside the state of California. But, I mean, California obviously sees that differently. It says, no, it is an in-state problem to have people running card rooms who have a corrupted influence by casinos. Now, it seems that people may disagree with that value judgment, but is that not an in-state problem? So policy wisdom is not something that ever really comes up in Dormant Commerce Clause cases. It's not the controlling factor. What the courts are looking at are the means used. And California has rules on the books that comply and are consistent with the Commerce Clause, which give the commissioner the ability to look at the applicant, the specific person in front of the commission, and decide whether that person is worthy or suitable or not for a California card room license. We have no problem with that. We agree with California that it needs to protect the integrity of its gaming market. If that was absent, we wouldn't have a market. So we agree with that. It's the means used here that violates a number of problems that the Supreme Court and this Court have recognized. Mr. Parrish, you started in the last segment with Mrs. Flint, and then we interrupted you. Could you personalize it to this case? Yes. I'd like to talk about that. So Mrs. Flint owns dozens of retail stores outside of the State of California. Because of the statutes, she cannot take revenue from those stores and invest them, say, for example, by a 2 percent interest, a passive interest, in a publicly traded company. She can't do that if the company happens to be a gambling-related company. These are all lawful economic transactions. But she can't do it because she has a card room license in California. Mr. Collegian, Jr., as well, another one of the plaintiffs, owns a restaurant in Nevada. And he can't use revenue that he's earned there, just like Mrs. Flint, revenue that is never passed through California, to invest in lawful businesses in other States. I am not aware of a Supreme Court case or a case from this Court where that type of restriction has ever been upheld. It certainly was not what was going on in pork producers. This Court looked at Daniels and Christie's, which were not nearly as burdensome as this regulation, and saw them as a much different category of regulation from pork producers. I cannot imagine the Supreme Court, if it had an analogous statute here, where pork producers who were outside of the State of California, you know, if they decided to sell crated pork, or if they decided to invest in a company that sold crated pork in excess of a 1 percent interest, they couldn't enter California's  I mean, that is something that just, it violates a number of tenets that this Court and the Supreme Court have over and over again affirmed in case after case. Was there any reason to think gambling should be looked at somewhat differently? Look, it's regulated in States. So what's happening in the State is fully regulated. You know, it's, I suppose you could say it's somewhat of a vice market, but there, it's lawful, right? We're not talking about, say, for example, marijuana and say someone is, you know, selling, is a part of a marijuana dispensary in another State. Where there, it's illegal federally, right? And so people who are in that type of a business can't get normal, regulated, transparent banking. There's large quantities of cash being exchanged. If that was the type of thing, I think there could be an issue where you would think, well, maybe that person's not suitable because of these large cash transactions that, like, no one's able to follow. We don't have that here. We have a fully lawful economic activity in other States, and our clients are deprived of the right to engage in it. And from, you know, the very beginning of this country and every Supreme Court opinion, and it really is covered extensively in Dennis v. Higgins, that right can't be trampled by any State. No State has the power to do that. And California doesn't have the power here to do this. Thank you. Thank you very much. Thank you. We thank both counsel for the very helpful briefing and argument. This matter is submitted.
judges: BRESS, VANDYKE, Lasnik